[Cite as *State v. Tanner*, 2025-Ohio-2087.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30264 |
| | : | |
| v. | : | Trial Court Case No. 2024 CR 00739 |
| | : | |
| KAYLA J. TANNER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on June 13, 2025

. . . . . . . . . . .

MARY ADELINE R. LEWIS, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Defendant-Appellant Kayla J. Tanner appeals from her conviction for aggravated possession of drugs following a no contest plea. On appeal, Tanner contends that the trial court erred in overruling her motion to suppress the evidence obtained during

a traffic stop. Tanner argues that the duration of the traffic stop extended beyond what was reasonably necessary to resolve the issue that initially led to the stop, in violation of her Fourth Amendment rights. For the reasons outlined below, we find that Tanner's argument has merit. The judgment of the trial court will be reversed, and the matter will be remanded for further proceedings.

## I.      Background Facts and Procedural History

{¶ 2} On January 1, 2024, at around 6:41 p.m., Tanner was pulled over in a high-crime area by Officer Land of the Moraine Police Department for failing to stop behind the stop bar at a traffic light. Tanner had a passenger in her vehicle, "Mr. Vanscoy." Officer Land recognized Tanner's vehicle as the same vehicle that had contained two "passed out" females parked at a Circle K two months earlier, one of whom was Tanner. Upon recognizing the vehicle, Officer Land followed it and pulled Tanner over when she failed to make a proper stop.

{¶ 3} Officer Land approached Tanner's vehicle on the passenger side. Tanner immediately explained that she was in the area because she had just fixed her vehicle's flat tire. Officer Land asked for Tanner's and Vanscoy's identification. Upon investigation, he found that both of them had prior drug convictions but no active warrants, that Tanner was the owner of vehicle, and that Tanner had no limitations on her driver's license. Approximately four minutes into the stop, Officer Land requested a drug-sniffing canine from the Kettering Police Department, believing he had reasonable suspicion that criminal activity was taking place.

{¶ 4} In the meantime, Officer Porter arrived on the scene, and Officer Land

directed him to talk to Tanner and Vanscoy and to watch their hands for suspicious movements. After talking with the occupants of the car, Officer Porter returned to tell Officer Land that they were in the area visiting two other people who were locally-known narcotics users.

{¶ 5} Before the canine arrived, Officer Land asked Tanner to step out of the vehicle, at which time he observed no indication that she was intoxicated. He patted her down and asked her if he could search her vehicle; she refused to consent to a search after being told that she did not have to consent. Officer Porter also asked Vanscoy to step out of the vehicle.

{¶ 6} Officer Hall arrived with Thor, the canine, approximately eight minutes into the stop. During this time, however, Officer Land had suspended his efforts in issuing the traffic citation, which was the original reason for the stop. At Officer Hall's direction, Thor then conducted a free air sniff of the vehicle, signaling a positive alert approximately 12 minutes into the stop. Officer Hall denied directing Thor's actions but admitted that his hand may have gone into the window of the vehicle when he was leading Thor around it. Officers Land and Porter then executed a probable cause search of the vehicle, finding three syringes (one containing a pink substance) and two glass pipes used for smoking methamphetamine.

{¶ 7} Tanner was then detained and placed in the rear of Officer Land's cruiser. After the search of the vehicle was completed, Officer Land issued her a citation for the stop bar violation. Tanner was later charged with one count of aggravated possession of drugs in violation of R.C. 2925.11(A); one count of possession of a fentanyl related

compound in violation of R.C. 2925.11(A); one count of drug paraphernalia in violation of R.C. 2925.14(C)(1); and one count of possessing drug abuse instruments in violation of R.C. 2925.12(A). She initially pled not guilty to all the charges.

{¶ 8} In April 2024, Tanner filed a motion to suppress, alleging that the traffic stop had been improperly extended and that the breach of the window by the canine's nose during the free air sniff had constituted an illegal search. At the suppression hearing, Officer Land testified that he had not begun writing the ticket for Tanner's traffic violation until after the canine alerted.

{¶ 9} The trial court overruled Tanner's motion to suppress. It found that, even though Officer Land did not prepare the citation for Tanner when he obtained her information and identification at the start of the stop, he had performed some routine procedures. The court stated that, while waiting for the canine, Officer Land had not just stood on the sidewalk expecting assistance from other officers and the canine unit; rather, he had pat down Tanner and sought her consent to search the vehicle. The court also pointed out that Officer Land testified that he typically required 20 minutes to complete a traffic citation and that the free air sniff had been completed within 15 minutes of the stop. Under these circumstances, the trial court concluded that Officer Land had not incrementally prolonged the stop in order to perform a drug sniff, that he had been reasonably diligent in pursuing the traffic-related purpose of the stop, and that the overall duration of the stop was reasonable in relation to the duration of other stops involving similar circumstances. The court also concluded that the free air sniff had not constituted an illegal search because Officer Hall, the canine handler, had not encouraged or insisted

that Thor enter the vehicle and, in fact, Thor had not entered the vehicle but only jumped up near an open window.

{¶ 10} Following the denial of her motion to suppress, Tanner pleaded no contest to the aggravated possession of drugs charge, and the remaining three charges against her were dismissed. She was sentenced to community control for up to five years. She timely filed her notice of appeal, challenging the trial court's decision to overrule her motion to suppress.

## II.      Assignment of Error

{¶ 11} In her sole assignment of error, Tanner contends that the trial court erred in overruling her motion to suppress. She asserts that her Fourth Amendment rights were violated when the police failed to practice reasonable diligence when issuing her a traffic citation. She argues that the issue in this case was not whether the stop as a whole lasted a reasonable amount of total time but rather whether the duration of the stop was prolonged beyond what was reasonably necessary to resolve the issue that initially led to the stop (e.g., a traffic violation).

{¶ 12} Tanner specifically argues that the Moraine Police extended her stop beyond what was reasonable for issuing the citation. Tanner points out that she was stopped by the police for failing to stop behind the stop bar at a red light. Officer Land then asked her a series of general questions pertaining to her license and registration and was back in his cruiser within 90 seconds of initiating the stop. While in his cruiser, Officer Land ran Tanner's plates, determined that she was the legal owner of the vehicle, and checked for any warrants. Tanner argued that Officer Land prolonged the stop by

requesting assistance from another officer and the canine and then stalled his issuance of the citation for the original offense until after the canine had arrived and inspected her vehicle. While she acknowledges that the stop lasted approximately 12 minutes from the start to the time the canine finished its inspection, she emphasizes that Officer Land spent well over eight minutes conducting "investigations" that had nothing to do with her original offense and, in the meantime, even suspended working on the citation. She contends that any amount of time added to her stop as a result of a subsequent, unrelated investigation was not supported by reasonable suspicion and violated her Fourth Amendment rights.

{¶ 13} In response, the State contends that the canine sniff did not unreasonably prolong the duration of the stop. In support of its argument, the State cites several cases in which brief stops were found not to be in violation of the Fourth Amendment. The State further contends that, even if the stop was extended to perform the canine sniff, Officer Land had reasonable suspicion of criminal activity that justified prolonging the stop: the stop was in a high-crime area; Officer Land recognized the vehicle from a prior incident involving suspected narcotics use; Tanner may have been under the influence, which could have contributed to her failure to stop at the stop bar; the vehicle was cluttered and difficult to visually inspect; and Tanner and Vanscoy had prior drug convictions and had just come from visiting other known drug users.

{¶ 14} Our standard of review for a motion to suppress presents a mixed question of law and fact. In considering a motion to suppress, the trial court assumes the role of the trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. *State v. Cosby*, 2008-Ohio-3862, ¶ 11 (2d Dist.), citing *State*

*v. Clay*, 34 Ohio St.2d 250 (1973). We accept the trial court's findings of fact if they are supported by competent, credible evidence, but we must independently determine as a matter of law whether the facts satisfy the applicable legal standard without deference to the trial court's conclusion. *Id.*, citing *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist. 1994); *see also State v. Brock,* 2010-Ohio-5885, ¶ 12 (2d Dist.), citing *State v. Burnside,* 2003-Ohio-5372. In other words, in reviewing the trial court's ruling on a motion to suppress evidence, we must accept the findings of fact made by the trial court if properly supported, but we apply the de novo standard of review regarding whether the trial court's conclusions of law regarding those factual findings were correct. *State v. Rhines*, 2011-Ohio-3615, ¶ 16 (2d Dist.), quoting *State v. Johnson,* 2010-Ohio-6224, ¶ 10 (2d Dist.), citing *State v. Keller*, 2000 WL 20873, *3 (2d Dist. Jan. 14, 2000).

{¶ 15} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . ." Thus, under the Fourth Amendment, individuals are protected from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1 (1968); *State v. Pressley*, 2012-Ohio-4083, ¶ 18 (2d Dist.). "The basic purpose . . . [of these constitutional provisions] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Retherford* at 593, quoting *Camara v. Mun. Court of the City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967). The State, therefore, has the burden of proving that the search was valid because warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few established and

well delineated exceptions." *State v. Hilton*, 2009-Ohio-5744, ¶ 21-22 (2d Dist.), citing *Xenia v. Wallace*, 37 Ohio St.3d 216, 218 (1988).

{¶ 16} A traffic stop is a seizure within the meaning of the Fourth Amendment. *See Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984); *City of Dayton v. Erickson*, 76 Ohio St.3d 3 (1996). An investigative stop of a motorist, however, does not violate the Fourth Amendment if the officer has a reasonable suspicion of criminal activity. *Berkemer* at 439. "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1995), citing *Terry*. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *State v. Jordan*, 2004-Ohio-6085, ¶ 14, citing *United States v. Cortez*, 449 U.S. 411, 418 (1981). The articulable facts must be judged against an objective standard: whether the facts available to the officer at the moment of seizure or search would warrant a person of reasonable caution in the belief that the action taken was appropriate. *Cosby* at ¶ 17, citing *Terry*. An officer's inchoate hunch or suspicion, however, will not justify an investigatory stop. *Id.*

{¶ 17} "It is well-established that a canine sniff does not constitute a search under the Fourth Amendment." *State v. Ramos*, 2003-Ohio-6535, ¶ 8 (2d Dist.), citing *United States v. Place*, 462 U.S. 696 (1983). Thus, a police officer does not need to have reasonable suspicion that a vehicle contains contraband before summoning a canine drug unit. *Id.* However, "[t]he duration of a traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts

that further detention was reasonable." *Id.* at ¶ 10, citing *State v. Chatton*, 11 Ohio St.3d 59 (1984).

{¶ 18} "When a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." *State v. Thomas*, 2009-Ohio-3520, ¶ 14 (2d Dist.), citing *State v. Pryor,* 2005-Ohio-2770, ¶ 15 (2d Dist.); *Ramos* at ¶ 11. "In determining if an officer completed the tasks of a traffic stop within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation." *Id.*, citing *State v. Batchili,* 2007-Ohio-2204, ¶ 12.

{¶ 19} "Ohio courts do not apply a bright-line test as to a specific amount of elapsed time to determine whether a traffic stop has been unreasonably prolonged." *State v. Kincaid*, 2024-Ohio-2668, ¶ 20 (4th Dist.). The Supreme Court of Ohio has held, "[a] traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and *not yet completed* at the time a drug dog alerts on the vehicle." (Emphasis added.) *Batchili* at ¶ 14. Additionally, other Ohio courts have found Fourth Amendment constitutional violations involving relatively short traffic stop durations. *See State v. Byrd,* 2022-Ohio-4635 (8th Dist.) (although canine sniff occurred within 15 minutes of traffic stop, officer acknowledged investigation concluded eight minutes before canine's arrival); *State v. Thomas,* 2020-Ohio-3539 (9th Dist.) (traffic stop was not completed within reasonable period of time where the officer normally took 10 to 15

minutes to write a warning, but evidence showed "a pause of more than three minutes during the stop, prior to the arrival of the K-9 unit, where the officer was not diligently conducting the investigation."); *State v. Neyhard*, 2022-Ohio-1098 (11th Dist.) (ten minutes was unreasonable where video and testimony did not "affirmatively demonstrate that the officer was awaiting any information from dispatch necessary to finishing the tasks reasonably related to the purpose of the stop."); *State v. Green,* 2016-Ohio-4810 (7th Dist.) (officer made the stop, then called for a canine officer and wrote and issued the warning in one to two minutes; the canine took ten minutes to arrive and another three minutes to search the vehicle, and the canine sniff was not completed until 11 to 12 minutes after the warning issued, extending the time beyond the time required for the traffic stop).

{¶ 20} The crux of this matter is whether Tanner was unreasonably detained between approximately 6:41 p.m., when she was stopped, and 6:53 p.m., when the canine alerted to narcotics in her vehicle, thus rendering the search of her vehicle unconstitutional. Tanner contends that the Moraine Police extended her stop beyond what was reasonably necessary for issuing the citation. While the drug sniff occurred within approximately 12 minutes of the stop, the issue was not whether the stop as a whole lasted a reasonable amount of time. The issue was whether the stop was prolonged beyond what was necessary to resolve the reason for the stop. The record in the present case persuades us that Tanner's detention was unduly prolonged to facilitate a drug sniff.

{¶ 21} Although this was not an unusual length of time for a traffic stop, Officer Land had already acquired the requested information regarding the registered vehicle's

owner and the criminal backgrounds of Tanner and Vanscoy when he called for the canine unit. There was no evidence that Officer Land was awaiting any additional information from dispatch necessary to finish the tasks reasonably related to the purpose of the stop— namely, issuing the citation. However, while waiting for the canine, he suspended his efforts to issue Tanner the citation and did not resume those efforts until after the dog alerted. Thus, while he diligently obtained identification and background checks for the purpose of the citation, those checks had already completed, not only before the dog alerted but also before the dog was even summoned. As a result, Land's investigation of the traffic violation concluded before the canine's arrival. Under the Fourth Amendment, absent reasonable suspicion, he was only permitted to detain Tanner for the amount of time necessary to issue the citation and perform routine procedures, such as a computer check on the motorist's driver's license, registration and vehicle plates. Although the State contends that Officer Land had a reasonable suspicion to prolong Tanner's detention in order to bring in a drug sniffing dog, we disagree.

{¶ 22} The facts known to Officer Land at the time that he called for the canine unit were: the stop was in a high-crime area; Tanner's vehicle was cluttered, difficult to visually inspect, and had been involved in a prior incident involving suspected drug use; and Tanner and Vanscoy had prior drug convictions. We cannot say that this was enough to create a reasonable suspicion of criminal activity in this instance to justify prolonging the stop.

{¶ 23} First, there was no evidence that Tanner was under the influence, and Officer Land even admitted that she did not appear to be intoxicated. Officer Porter did

not learn that Tanner and Vanscoy had come from visiting other locally-known drug users until after Officer Land had already prolonged Tanner's detention by calling for the canine unit and waited for the unit to arrive (without working toward issuing the citation). Officer Land noted that Tanner's vehicle was untidy, but he did not explain how that raised his suspicion that she was in possession of drugs. He did not observe any paraphernalia when patting her down or in the vehicle when he initially spoke with her. Although Officer Land did not need to have reasonable suspicion that Tanner's vehicle contained contraband before summoning the canine unit, he did need to have specific and articulable facts to justify prolonging the duration of the traffic stop beyond what was necessary for him to issue the citation. His purported reasons for prolonging the stop were known to him from the outset, and he did not provide an explanation for why he did not continue with the process of writing the ticket.

{¶ 24} There was no evidence that Officer Land was diligently completing the necessary steps to conclude the traffic-related investigation or that he diligently wrote the ticket in a timely fashion. To the contrary, the videotape of the stop showed that Officer Land did not make an effort to write the ticket until after the canine alerted, and Land even admitted during his testimony that he had not begun writing the ticket until after the alert. This was not a reasonable effort to complete the ticket or the stop. Accordingly, the record does not support the State's argument that Tanner was not detained beyond the time reasonably necessary to complete the traffic-related investigation. The State had the burden of proof on this issue, and, in our judgment, the record fails to demonstrate that Officer Land continued to be engaged in traffic-stop-related activities up to the time that

the drug-sniffing canine gave him probable cause to search Tanner's vehicle for narcotics. Under these circumstances, we cannot conclude, without speculation, that the dog alert would have occurred within the time necessary to complete the traffic-stop-related investigation and to issue the citation.

{¶ 25} We acknowledge that these facts led Officer Land to suspect that something was amiss, but he was unable to articulate specific facts to support a reasonable suspicion that Tanner's vehicle at that moment contained drugs. Thus, in reviewing the totality of the circumstances, we cannot say that Officer Land's reasons for detaining Tanner were anything more than a hunch. We conclude that Officer Land lacked reasonable articulable suspicion that Tanner possessed drugs so as to furnish him with justification for detaining her until the drug-sniffing dog could confirm or dispel that suspicion. Having concluded that Officer Land lacked a reasonable articulable suspicion that Tanner was in possession of drugs, we further conclude that he detained Tanner for an unreasonable length of time, and thus the evidence found in her vehicle should have been suppressed. Tanner's assignment of error is sustained.

### III.    Conclusion

{¶ 26} Tanner's conviction for aggravated possession of drugs will be reversed, and the case will be remanded to the trial court for further proceedings.

. . . . . . . . . . . . .


EPLEY, P.J. and HANSEMAN, J., concur.